Before we begin our regular proceedings, we're going to do what promises to be the high point of the day, and I'll recognize Judge Rayna for that purpose. Thank you, Chief Proce. Chief Proce, when I move for the admission of Anna G. Phillips, she is a member of the Bar and is in good standing with the highest courts of California and Texas. I acknowledge her credentials and I'm satisfied that she possesses the necessary qualifications. Anna, can I get you to stand? I just want to point out that time flies when you're having fun. It also flies when you're working hard, so time must have really flown past for you this past year. It flies even faster the older you get, so this past year of you working for me has been pretty fast, but it's been marked by your work ethic, your professionalism, and your high quality of work. I know that before us stands an excellent practitioner that we can move to the admission to the court. We're enthusiastically agreeable to granting the motion, and now if Judge Bryson will recognize me, I have a motion. I recognize you, Judge. Aaron, can you please stand? I move the admission of Aaron Leach, who is a member of the Bar and is in good standing with the highest court of California. I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications. I've said this before, one of the weird things about being a judge is that we pick the best candidates out of a large group, and then they join us. In cases like Aaron, they nonetheless far exceed whatever high expectations we had in the first instance. Then in the real world, you law firms or your companies work hard to keep those people for as long as you can. In our judges world, they leave after a year, a year and a half. We have to say goodbye temporarily. I say to women's groups that I speak to, I tell them, I know you want to be and you will be fabulous lawyers, and I know you want to be and you can have it all, but maybe not all at once. Sometimes there's an exception, and we found her in Aaron. Even charity is amazed at the way Aaron is able to juggle her life, and that's a pretty high feat. I'm understandably very sad that Aaron and her crew, including my first set of twin grand clerks, will be moving across the country, but I have no doubt for her future success personally and professionally. She's brought real joy and comfort to my chambers, and I thank her for all of her hard work, her great judgment, her mature judgment, her warmth, and just the pleasure of having her around. Thank you. Okay, motion is granted. Now, can both candidates be sworn in, please? Congratulations. All right, now back to work. The first argument this morning is an 18-1167 Cell Gene Corporation versus Peter. Now, let me just say logistically for both sides, we've got two cases, and the patent issues are different in both cases, so we hear them separately, but there's an overlapping retroactivity constitutional argument, so we don't want to hear the same thing twice. We'll be a little more generous in the time, maybe the first time out, but not so much in the second. So please proceed. Thank you, Your Honor, and may it please the court. In fact, that's where I was going to go, and explain that this case and the one that follows involve methods for delivering a teratogenic drug to patients. This first case, we have this in sort of, because we have this case in numerical order of the docket numbers, this case involves the enhanced version of Cell Gene Steps Program and the patent that covers that. The second case will involve the original Steps Program, which preceded that, and the patent, the 501 patent that we demonstrate in our briefs, and I'll hope to elaborate here today, that the Board's rulings canceling our patent claims resulted in an unconstitutional taking, because of Congress's creation of the inter partes review process after the application for an issuance of those two patents. Wouldn't a determination on takings in this case involve some sort of factual finding at some point? I don't think so, because we have a complete and total taking of our patent claims in both of these cases. So there shouldn't have to be any sort of individual evaluation of the taking here. And ultimately, all we're saying to this Court, Your Honor, is give us our patents back. That's the remedy we seek from this Court. Is this the right Court to tell then? I mean, what about the Court of Federal Claims? Why shouldn't this case be there? The Court of Federal Claims could give us compensation if this Court were to, say, one, not rule substantively on the takings claims in this case. But I think both sides have urged the Court to resolve the takings claim in this case, if it does indeed become ripe. Of course, a reversal in this case will moot out the reversal, total reversal, either in each case. That might be a little strong. We can ask the government, but I'm not sure they're urging. I mean, they're recognizing that we have the authority, if we wish, to take this case up, even with the Board not having previously considered the constitutional question. But I think that's a little strong. It might be just a wee bit strong, Your Honor. But they do argue that we have waived this by not presenting it to the agency. But, in fact, an Article I agency would not be in the position to declare its own statute that created it unconstitutional. What is, do you think, the most powerful support for that proposition? The most powerful support for? The proposition that an Article I agency cannot declare its own statute to be unconstitutional. Well, Judge Bryson, without being? Article I judges, in this case, take the same oath that we do. And if they conclude that the work that they're doing is, in fact, contrary to the Constitution, what is the reason that they can't act based on that conclusion? Well, first of all, I think, I'm tempted to say, without being too cute about it, that Marbury v. Madison is the answer to that. Do you have anything that's more specifically directed to the problem? Well, I think the more specific direction is both to say that separation of powers answers that question. Again, they do have. Both Marbury and separation of powers are pretty general. Do you have a case in which the Supreme Court or other courts have said, in hyperbole, an agency may not declare, or judges within the agency, Article I judges, whatever, may not declare a statute? I cannot, we did not cite one in our briefs, and I cannot think of one Judge Bryson standing here. But at the same time, I would point out that in the case that is cited by the government for the proposition that we could have raised this, that was a case where the remedy that the agency level was the replacement of two judges who were constitutionally appointed. But it does, it is, it seems to me, at the very least, passing strange to ask an agency, an Article I agency, to declare that it is itself unconstitutional, or that it is unconstitutionally taking patents that were issued before. Well, suppose, though, that you had the Temporary Emergency Court of Appeals. I think you and I are probably both old enough, if I can presume. You may, you may. To remember that august body. It was judges, Article III judges were selected and put on that court. Suppose that the judges of that court had concluded that the court itself was unconstitutionally created. You wouldn't have any doubt that they could have the authority to say, we are, as a body, unconstitutional, would you? I think that's right. Is that just because they happen to be Article III judges? I think in that case it would. That would be the distinction I would offer. So if you created the Temporary Emergency Court of Appeals from Article I judges, and start, say, one Article I judge and two Article III judges, then they couldn't do that? I think it would be a harder question than if you had Article I judges about their authority to do that. In fact, I remember the oil states argument, sitting there waiting to argue the Sass argument, where the Chief Justice took issue with the Petitioner's Council in oil states for even referring to the administrative patent judges before the PTAB as judges. It is, if I may, I'll be certainly happy to continue with the constitutional argument. I had intended to start with the patent claims and then get to the constitutional argument on the basis of constitutional avoidance. But I certainly don't want to take this argument in a different direction. Let's just stay with the constitutional argument. We're pretty down. Well, let me ask you about the, just to follow up on Judge Bryson's point. We'll ask the government, obviously, but I know the government has argued this thing before, before other panels, not me, but before other panels. And I think what they've said in terms of their authority is that, well, how do you implement that? If you find it's unconstitutional, what do you do with that? And I understand their only answer is, well, then we don't institute because we have the authority to not institute. Do you have a better answer than the government's? Because I, you know, we'll ask them. But if that's their sole authority, to declare something unconstitutional, is to refuse to institute, that seems a little odd to me. One, because in theory that's a nonreviewable decision. Right. Although you'd think if Mandamus still lived in that context, this would be the place to use it. But do you know any other, anything else they could do within their authority if they viewed this statute as being unconstitutional? I think that they could either decline to institute, as they've suggested, on any patent that was issued or perhaps applied for before the effective date of the AIA. Or they could, I suppose, institute and then make a decision that is a final written decision on that very issue. And then say, we've instituted, but we regret that we instituted because we don't have the authority to do that. The IPR statute, of course, is unusual in that regard in terms of the institution decision and the final written decision, one being appealable, the other not. But of course, there's already one board decision, which I think is non-precedential, that says it's constitutional. Right? Are you aware of any more? I know of one. I don't know which one you're referring to, but I don't know of any others. I don't know of any right now. Why didn't you raise it before the board? Why didn't we raise it before the board? Because honestly, our taking wasn't ripe until the board took our patents. And all we would have been able to say is, well, gee, if you do take our patents, then that might be a taking under the circumstance. Isn't your argument that the entire IPR process is unconstitutional? Oh, no. No, no. We just say that it is a taking if a patent that the property right came into being by issuance of the patent before the passage of the AIA. It's only a retroactive taking. It's only a retroactive taking. And in fact, in Chief Judge Proch, there's an important point to make with regard to the comparison to inter partes reexamination, which this scheme took place of. When Congress passed the Inter Partes Reexamination Act, it made it prospective only. And that's an important distinction, both with regard to what Congress did later, as well as what Celgene's expectations were at the time of the patent issuances with regard to any future enactments by Congress. That surely any sort of inter partes post hoc review system that might take away a patent would only be prospective, just like the expectation created by the way that Congress passed the Inter Partes Act, the Inter Partes Reexamination Act. So the difference between the two, in your view, is that this is more probing higher standards in the sense of easier for you to lose your patent than would be the case, just generically speaking. Well, I could go, I could, Judge Bryson, give you a laundry list of those things. I understand, but that's the gist of it, isn't it? Yes. That it's just put you in a position that the burden is greater than it would have been under a regime that was in place at the time you applied for it. Well, that's right, and it's put our patents at risk, and indeed, you know, the... Well, let me ask you, in that light, let me ask you, looking for an analogy here in another area, suppose under the Homestead Act of 1862, where people were given the right to get property in unsettled areas on the condition that they settle and farm there, suppose that the Act had had a provision in it that said anyone with a previous felony conviction was not eligible for the Homestead Act allocation, and Congress discovered after five years that a lot of people who had previous felonies had actually applied for and gotten grants of homestead property and decided this is causing all sorts of trouble on the frontier, a lot of violence, and decided that they would let the... enact a statute that said the Interior Department may inquire, investigate, to whatever extent necessary, to determine whether any of these people actually have felony convictions. Would that be a taking with respect to any of the people who are on the land and who are discovered to have felony convictions? Well, when we get into the land area, as you've seen in our brief, we have...so I think the answer is probably yes to your question. Let me start there. It would be a taking. I think probably yes, and I'm going to explain why, because we've offered in our brief the analogy in this case to adverse possession, and even if the nefarious land obtainer in your hypothetical had obtained the land even though he or she had a felony conviction, I guess in the 1860s we'd say he, the practical reality would be that at some point even if he didn't have a claim of right at the initial time or he should not have probably been given it, maybe in terms of investment and in terms of reliance, in terms of all of the requirements of the adverse possession law, he has a claim that he has, regardless of what the conditions were at the beginning, a claim of right as to that patent. And I think that's analogous to what we have here. But I'd also add, Your Honor, that in that case you're talking about a requirement that was in place at the very beginning of the process. Now, you could say, well, the analogy is, of course, you were supposed to get a valid patent, one that's novel and non-obvious. Right. The difference being that in the case of the Homestead, they did have the requirement there. They just didn't have a very robust enforcement, and they decided to make the enforcement more robust. And there it seems to me the analogy holds up. So that's perhaps true, but at the same time, if you look at the analogy to this case, it breaks down in the following way. When Celgene received its patents, which was after it applied for one, even before the inter partes statute was passed, but both were issued after the inter partes reexamination statute, I should be clear about that, was passed. When Celgene received its property right, it had every reason to believe that the only adversarial litigation it would face to take away its patent would be conducted in district court under a strong presumption of validity, which would have to be proved by clear and convincing evidence. In this case, it is as though, to use a land analogy that I've been thinking of, I own a house in northern Virginia, and I believe that I have the entire bundle of sticks to both my property and to my house. But let's say that the Virginia legislature decides to authorize or impose the ability of special panels of boards of zoning appeals to revisit the question of what access the public should have to my property. And after the fact, they declare that my house and my property should be open to the public. That's in effect what's happened here. Open to the public, but when you get into zoning and talking about takings, then you run into the Supreme Court's authority which says zoning is fine, it's not a taking. Well, zoning is generally fine. Generally fine. In the regulatory sphere. If they simply took your house as an eminent domain, which in effect is what you were saying, that's one thing. But if they said in your house you've kept pigs in the backyard, which was okay, but no more pigs, then that wouldn't be a taking. I think we'd agree on that. No, I think we could agree on that, but then I'd point you to Loretto, where the Supreme Court said that it is a taking to require the installation of a cable box, for example. Because that was a physical intrusion. That's the only reason that case got decided. Well, that's probably right, but here there's no possibility of a physical intrusion in the realm of intellectual property, but we do have, and the only point I was making there, Your Honor, is that in Loretto we have a little bitty intrusion, but it is a physical one. Here we have a total evaporation, a total evisceration of our property rights. Does it matter that patents are issued to persons and that land passes to a person, whereas a patent is a public franchise? Can you have a taking of a public franchise? Absolutely, Your Honor. In fact, if you look at oil states, Justice Thomas's opinion for the court says explicitly that a public franchise is a form of property right entitled to the same protection as any other property. For that proposition, it cites to the Supreme Court's old decision in James v. Campbell, which was the case that was quoted in Horn, the Raisin case that says that patents are property like anybody else's. So contrary to the government's submission in this case, there is a valid property interest. We had very much a reliance interest for the many years, and we built a business on it, quite frankly, without any expectation until 2011 that there was going to be a new board with new procedures that results in a 75% kill rate, according to the Dolan and Manta article, of patent claims, as opposed to the much more modest, about 12% of ex parte reexamination and, of course, the strictly forward-looking inter partes reexamination. If I could just make a couple of other points. Quickly, were you going to conclude on the constitutional question? I was. Okay. Because the only other point I wanted to make was about Pat Lex, and Pat Lex has been cited by our friends on the other side as having already decided this issue. I point out that the takings issue in Pat Lex was not treated with any great degree, but to the extent that it was, it relied on a standard that the Supreme Court has now made clear was only dictum from a pre-Pat Lex case, and in Chevron versus Lingle, the Supreme Court has said that's exactly the wrong standard. So Pat Lex does not stand in the way of this court revisiting the issue, and quite frankly, when this case is compared to the other cases that are either pending or have presented this issue to the court, I've looked at the briefs in those cases, and this is the case that presents this case most completely and squarely, and with that regard, we agree with the government's suggestion that this case might be an appropriate vehicle for deciding that issue. Okay. Why don't we give you another three minutes or so, if you need it, for the merits of the discussion? I appreciate it. Our case with regard to the enhanced steps program is relatively simple. The 720 patent really did something that was truly innovative, truly beneficial, and went actually against the grain of the state of the art in 2000. It required not just a doctor's prescription, in the world of medicine where doctor's prescribing authority is viewed as not only primal but exclusive, and it imposed a risk assessment between the doctor's prescription and the... But on the other hand, your main argument about what the PTAP did was that there was no motivation to combine. And that's right. So you're suggesting there was something really important and innovative. Doesn't that also suggest that people would have been out there hunting for that? People... The board in this case decided that there was a generic motivation to improve, and they say, well, that wasn't generic. It was very specific to this particular drug because of its dangers. That's true, but what the law requires is that the motivation be a motivation to create this invention, not just any improvement. And if there's always a motivation to improve, and we've known that since the expression, build a better mousetrap and the world will be the path to your door. What this case is about is taking random pieces from different pieces of prior art and saying, well, what you would do is assemble all of these in such a way that you would interfere and put a check on the doctor's prescribing primacy and require approvals before a pharmacy can issue this prescription. You said a moment ago that there's always a motivation to improve, and that seems to me to be right, but I thought that was contrary to at least part of your submission here, which was this system works so well that there really wasn't a motivation to improve. Well, I don't think that's contrary at all. I think there is always a generic motivation to improve in the abstract. There wasn't in this case any motivation to make this better. There was not, because it was already working with 100% perfection. Well, not quite, but close. Well, at the time of the application, that's true. All right. And yet, don't you think that in an area in which the consequences of failure are so catastrophic that working towards any improvement at all, there would be a motivation, that anything that could possibly make this more efficient, even if so far there hadn't been a catastrophic event, would be very desirable, if for no other reason than to avoid liability, which could be very large? Oh, absolutely. There is absolutely a case, and that's why I say there is absolutely a desire to make something better, but to make this. Now I'm confused, because I thought you were saying, well, in this particular instance, there really wasn't a motivation to make this better. Well, so I'm sorry if I'm being unclear. I think my arguments are consistent. So let me start with the proposition that generically and in the abstract, everybody wants to make something better. Right. New and improved. It's been on the shelves all of my life, and that's great, but that doesn't answer the obviousness question. The obviousness question is sensitive to context. It's sensitive to the particular set of prior art and the context that the prior art finds itself in. And so, yes, in fact, I'll even concede to you and concede that the government is partially right in that there was a desire, and in fact it's stated in one of the Celgene publications that was cited as prior art. It was like, we're going to make sure that this is as good as it possibly can be. That's great, but that doesn't answer the obviousness question. Because whether or not there's a generic motivation to combine, where's the motivation to make this particular invention? And there, context is critical. Part of the context is prescriber-doctor primacy in making the decisions about who gets what drug. In fact, that's recognized in the Powell reference that was cited, where Powell says the doctor prescribing thalidomide is entirely responsible for the patient's welfare. Well, that's not true under our invention. Our method is partially responsible, as well as the pharmacy responsible for the prescriber's welfare. And if I could just make one comment to conclude about, and you've been very generous on this one, and I'll try to make it up to you on the second case. Try. Dishman may be the closest reference that the government has, but it's really not all that close. That was the clozapine program administered by the VA, but that was a program about getting the drug and monitoring the effects of getting the particular drug for several weeks before determining whether the prescription could be continued or had to be stopped. That's not an unusual thing. Doctors monitor the way that prescriptions are given and whether it has side effects all the time. The invention here went far beyond that, and it wasn't just adding a prescription code, which is the way the government briefs this case. It is about adding the prescription code after a risk assessment to interfere potentially with the physician's discretion in prescribing and bar a prescription from even being issued. And with that, again, thank you for your generosity of time, and I'll return if you'll have me for a brief rebuttal. Thank you. May it please the Court? Now, just to be clear, you're here to discuss the last issue that Mr. Kirsten is here. Exactly. I'm here to discuss the merits, and then Ms. Allen will address the constitutional issues. So with respect to the merits, I want to say first that there is a lot in the reply brief, and as he's making here about this notion of overriding the doctor's decision, this was something that was raised only at the oral hearing. It wasn't in the briefing before the Board. And at page 25 of the Board's decision, it addresses it and says it's a new argument. What happened was at the oral hearing, they discussed this notion. Is this the story of drunk physicians? Yes. At the oral hearing, the Seligens Council raised this issue about how a drunk physician could potentially unwittingly prescribe thalidomide to a patient who was intending to become pregnant. And so in the Board's decision at page 25 of the record, the Board says, no, that's a new argument, we're not going to consider it, and they also said there's no substantial or sufficient and credible evidence to support it. Although in their brief they have a long string cite that they cite you to say that, yes, we did make this below, that long string cite has cites to both the initial, well, first to all three appeals, to both the initial Seligens brief as well as their responsive brief. There's essentially a handful in each of those. And if you look, for example, at the 1096, all of the arguments, the points that they cite to, it's all about this affirmative risk assessment, but nothing about this overriding the doctor. And, in fact, that's not required by the claims. They never were able to cite to anything the claim that required it, nor is it supported by the specification. In fact, when they talked about this whole notion of perspective, which they talked about at the hearing along with the overriding the doctor, the board asked them where is that in the claim, and at 7223 and 7234 of the record they basically said, well, that is required by the combination of steps C, D, and E. The board addressed those limitations in its decision, so this whole notion of overriding the doctor is simply not supported, is not something that was before the board, and in any event it was addressed by the board in addressing the claim limitations. I also will point out that when they were talking about perspective at 4439, one of the citations that they referenced, they actually said the difference, the distinction, the primary distinction between this patent and the earlier steps system is that duties were shifted from the pharmacist to the doctor. So it became it's the prescriber who's paramount, and in fact that's supported by their specification. In the specification they talk about it's the prescriber who is doing everything. It's the prescriber is, that is the distinction in the 720 as compared to 501. Why isn't it at least implicit in, and I'm looking at claims of 1E, that when you're talking about generating a prescription approval code to be retrieved by the pharmacy before the prescription is filled, that that occurs after the prescription is written by the doctor and therefore is a check in effect on the doctor's prescribing conduct? Yes, the prescription approval code comes after the prescription, but the claim. Presumably then the implication, at least as I read it, was that the pharmacist was holding the prescription which the doctor has written and is saying, uh-oh, the code tells me that this is a no-go. Isn't that the implication of 1E? The implication of E is that there has been a risk assessment, but when you look to the 720 before, they actually dispensed the drug. But in the claim, there is no indication of when that risk assessment takes place. And if you look to the 720 patent, it's very clear that the doctor is the one, the physician is the one who's making all the calls. It's the physician who is deciding, who is counseling patients, who is verifying informed consent, who assigns patients to risk groups, looking at columns 8 to 13, but in particular, and then ultimately prescribing the drug. For example, at the bottom of column 11, it talks about the patient receiving counseling. It's determined the drug is not indicated, and then the prescriber at the top of 12 may prescribe the drug. Further down on column 12, like at lines 52, it talks about after receiving counseling of the patient survey, and a completed patient survey, and if the pregnancy tests are negative, the prescriber fills out a new prescription for the drug. So it's ultimately the prescriber. After the risk assessment, the prescriber is doing the risk assessment. Then they prescribe. They send out an approval code, and then the approval code is what allows the pharmacist to administer or dispense the drug. And it's very clear at the beginning of this where it's distinguishing the two that it talks about. At the column 2, which is exactly what they said in their brief, that it's minimizing and simplifying the demands on the pharmacy. So all the pharmacy needs is the approval code, and then they administer the drug. But there's nothing in here and in the specification talking about overriding the doctor's decisions, the doctor who has the control here. With respect to the motivation, there was motivation, more than sufficient motivation. All that was required here was the addition of this approval code, and Cunningham teaches an approval code in the context of these trial products. They're also pharmaceutical products, and what the board found at page 20 is that it would be obvious to one of ordinary skill in the art to limit dispensation of a drug that was associated with adverse risk to those at high risk, to certain risk groups. And further, they also found at 23 to 24 of the record, the board found that a person of ordinary skill would recognize that this approval code that Cunningham used for trial products could similarly be used for controlling the administration or dispensation of pharmaceutical prescription products. And furthermore, it basically said that this is, in essence, a combination of prior art elements, these steps. They're all targeted to a known purpose of controlling drug distribution and to achieve the predictable result of avoiding distribution to high-risk patients. What do you say of your colleague's argument that there would have been no motivation to combine in this particular patent because the patent was working or the method was working at pretty much 100%? So in response to that, what the board found is that, much like Judge Bryson said, that when you're working in this world of high-risk drugs, that there would always be some motivation to improve upon the existing methods, to always try to close any loopholes, to make sure that the drugs are not distributed to patients where there could be potential risk. Do you have a motivation to combine in that situation where the success rate is, let's say, 100%, verifiable 100%? Well, as the board noted, the Zeldas article, that's at 501 of the record in Zeldas, where it talked about steps, it indicated that Celgene was indicating a willingness to make modifications to improve on the system. But let me also just say that the evidence that they brought forward of 100% success were two pieces of evidence. One was Mr. Freeman's declaration, which is their company representative, and the second was a confidential NDA, which is at 1511 of the record. Neither of those would have been available to a person of ordinary skill at the time of the invention other than Celgene employees. So with respect to your ordinary person of skill in the art, there would have been nothing to dissuade them from improving upon the existing prior art. If there's no additional reference, I'll leave Ms. Allen to address the constitutional issues. Thank you. Thank you, Your Honor. May it please the Court. I'd just like to start with the forfeiture issue and some of the discussion that was happening earlier to make clear that the Supreme Court has said in Thunder Basin and Elgin that there is no categorical bar to an agency considering constitutional issues. And so we think here the general rule that parties are required to raise arguments before agencies in order to preserve them should apply. So does the Board have the authority to decide if retroactive application of IPR is unconstitutional? Yes, Your Honor. What the Board could do here, if they had raised this argument before the Board and the Board agreed that applying IPR to this patent would violate the Constitution, then the Board could have exercised its discretion to decline to institute inter-parties review of this patent. Which is unreviewable generally, right? That's correct, Your Honor. But I would point out that even if this Court doesn't hold forfeiture, whether or not this Court finds forfeiture in this case, that unreviewability problem would still exist. Because in another case, when it was raised before the agency, if the agency declined to institute on the ground that it was unconstitutional, it still wouldn't be reviewable there. So I don't think the unreviewability of that question really bears – sorry, I don't think the unreviewability of the agency's decision to decline to institute really should change the Court's forfeiture analysis here. It would seem – well, perhaps you would view it differently, but it strikes me that mandamus would be a candidate that would be an attractive means of getting non-appellate review of this question. Yes, Your Honor. I'm not going to take a position about whether in a precise case mandamus would be appropriate, but we think that COSO has said that in general the agency's decision to decline to institute is non-reviewable, but potentially mandamus might be available. Now, what's in the pipeline? I know of one case that's in the pipeline. Top – Topgolf. Topgolf. Yes, Your Honor. That's the only case that I'm aware of in which a party did raise it before the agency. And that involves a pro se litigant. I'm just looking at all of the cases we have month to month where this question keeps coming up. Yes, Your Honor. And we've elided it in only one presidential opinion because the briefing was not sufficient but never really decided this question that we have here. That's correct, Your Honor. And, you know, as we've stated in our brief, we recognize that forfeiture is a discretionary choice that this court – But let me just add. So Topgolf is the only one you know of. Topgolf is a pro se case, right? That's correct, but I believe – And in that case, there was an 80-page board opinion, and the board did deal with the issue in the last two paragraphs of the opinion, in two paragraphs, right? And that was the sum and substance of what the board had to say about constitutionality? I think so, Your Honor. I'm not the attorney working on that case, but I do know that it is one example where the issue is preserved. But, you know, there are, as you recognize, there are a lot of cases raising this issue, and if the court wishes to go ahead and resolve it, we fully recognize that the court might want to exercise its discretion to do so. Most of those cases, the briefing is minimal, half a page, or maybe even just a couple of sentencings in passing. What about the case of Christie, Inc. v. United States in the Court of Federal Claims? They examined the issue where the takings clause argument in the context of a patent is a public franchise, and that case is on appeal. Should we wait until that case is? Are you familiar with that case? I think I'm not very familiar, Your Honor. Okay. I mean, I think if this court – Our point is just that we want to – we feel that there's a reason to make the forfeiture argument. We think that institutionally litigants should be required to raise arguments before the agency so that the agency has the first chance to opine on the issue, which can, as the Supreme Court recognized in Elgin, can be beneficial to courts when later reviewing it. But we're in a circumstance where, as I said, in Topgolf, it was a non-precedential two-paragraph opinion by the board. I assume that doesn't bind other PTAB boards. So we could end up with a situation where you've got six PTAB decisions, three going one way, three going the other, all of which are non-precedential, right? I mean, that's the regime we're living under. Yes, Your Honor, and for those reasons, as we stated in our brief, we recognize why you might want to go ahead and decide the issue, and we think that on the merits it's very clear that there's no – Well, let me ask you about the merits. Is it the government's view? Are you arguing that a patent can't be a property right for purposes of the takings clause, or is your argument more nuanced than that? It is more nuanced than that. Okay. We don't dispute that a valid patent is property for purposes of the takings clause. Our position here on the merits – So it's a valid property right subject to the takings clause unless and until it's invalidated? Is that your view? I think so, Your Honor. Our position is just that what happens when, in this case, when the board conducts IPR, what the board is doing is it's determining that the patent holder never had a valid property interest because the patent never satisfied the substantive conditions of patentability. And then the patent isn't actually canceled until this court would affirm that determination in this proceeding. And so in that sense, it's really no different than in district court litigation, where a district court determines that a patent is invalid, and then this court affirms that determination. Well, your friend's argument, though, is on the retroactivity piece of that,  that client knows what the standards are in the district court proceeding, and they can anticipate that, whereas in the IPR proceeding, whether we had re-exams or whatever, the standards were different. So the expectations when the patent owner obtained his patent have been changed. Well, Your Honor, I mean, the procedures have changed somewhat, but I just want to be clear. The substantive conditions of patentability are the very same conditions that existed when this patent was issued. The patent holder was on notice of that when he applied for the patent. And this patent was subject to both ex parte re-examination and inter-partes re-examination, and the Supreme Court made clear in court zone- But don't the standards matter? Because that's how you assess the risk that you might subsequently lose the patent in the proceedings. And as your friend pointed out, the risks were different under the old regime because of different standards and so forth. Just to be clear, under inter-partes re-examination and ex parte re-examination, the same standards apply as do in this proceeding. The only difference is the standard for initiation, which now they actually have to prove a reasonable likelihood of success, whereas before it only had to be a substantial- The IPR process became adversarial in nature. Well, Your Honor, it is true that there are more participation rights for- Doesn't that raise the risk? Sorry? Doesn't that raise the risk of having your patent found to be invalid if you're involved in an IPR? Well, Your Honor, it's true that- I mean, someone could bring an- Both ex parte re-examination and inter-partes re-examination could be prompted by a third party filing something with the agency. And as the Supreme Court explained in Quozo, the purpose of inter-partes review is the same basic purpose as inter-partes re-examination and ex-partes re-examination. And then also, just on the question, he's also compared- So I think it's really important to keep in mind that these patents were subject to agency administrative reconsideration when they were issued. And then second, to the extent that they're complaining about the differences between district court litigation and agency reconsideration, this court held in Patleks that there is no property right in the presumption of validity. And while they criticize Patleks because they argue that Patleks in undertaking- that the takings clause does not look to the rationality of Congress's action, the part of Patleks that they're pointing to is the court's due process analysis. And of course, the due process analysis is whether Congress had a rational basis. So that portion of the opinion has not been undermined. And then this other portion of the opinion that I'm talking about, where the court held that there was no property right in the presumption of validity, that doesn't involve the rationality analysis at all. So we think that Patleks is clearly still good law, as is Joy Technologies, and that there has been no taking here, really for the fundamental reason that once this court agrees with the board, that the substantive conditions of patentability aren't met here, there is no property that is being taken away. I'm wondering how far you would go with the proposition that there's no property right in the presumption of validity. Suppose that the inter partes statute was enacted by a Congress that was vehemently opposed to patent protections, and they said that the burden was on the patentee to show by clear and convincing evidence that the patent was valid. You still think no problem? No takings problem? Your Honor, I'm not saying that there would be no procedures that Congress could enact that would change so much and make it virtually impossible. Well, how about in my example? You think that would cross the line to being a taking? Well, Your Honor, here, I think, I mean, the point is here what they're complaining about is that the presumption of validity doesn't apply. And this court has addressed that precise issue in Patleks. Answer the hypothetical, if you could, please. Sorry, if it changed the... Yeah, suppose instead of the standard that was adopted in the IPR statute, Congress had decided we're really going to turn the screws on the patentees, and we're going to expect them, require them to show by clear and convincing evidence that the patents are valid. Anything less than that, patents go out. Would that constitute enough of a change in the regime to be a taking? I'm not sure, Your Honor, but here there has been no change, because the clear and convincing evidence standard is the same standard. Sorry, the fact that you have to... Sorry. The preponderance of the evidence standard that applies in inter-parties review is the same standard that applies in inter-parties re-exam and ex-parties re-exam. So there has been no change here. But not in district court. Right, to the extent we're comparing it to district. So first of all, I think it's important to realize that this patent is subject to agency administrative reconsideration, and it was when it was issued, so there has been no change in the standard. Even though that's true, if you want to compare it to district court litigation, I agree that the standard of proof has changed, but this court held in Patlex... But you don't think the change... My question was predicated on your assertion that a change in the standard can't be a taking, and I was trying to test how broadly you were prepared to defend that proposition. Well, at least as broadly as this court held in Patlex, which... At least broadly enough to win this case. Which is what this court held in Patlex, because just to be clear, in Patlex there was no agency administrative reconsideration whatsoever. So when those patents were issued, there was no way, as this court explained, there was no way that it could be brought back before the agency for reconsideration. It could only be invalidated in district court. And by contrast here, for 40 years there has been agency reconsideration of patents. And so, if anything, this is a much easier case than Patlex. If there are no further questions. Thank you. Thank you. We'll give you two minutes of rebuttal. Thank you. I'll try not to use it all. Try. With regard to the merits of the appeal, Judge Bryson, I think in particular, you had a colloquy with my friend on the other side about the ordering and the overriding. And the case was made that overriding was a new argument made by Selgene. It wasn't. What was a new argument was that it would interfere with a so-called drunk doctor making an erroneous prescription. That was said to be a new argument. But there's actually not an implication, but an express word of the claim that is important with regard to the timing of the approval. And that's the word upon in claim step 1E. And it's only upon the approval code that the prescription can be issued. That's been our argument all along. My friend also referred you to a number of places in the specifications, for instance at the bottom of column 12. That is discussing the physician's initial prescribing that has nothing to do with the generation of the approval code. If the court looks at column 13, lines 45 to about line 54, you will see that the approval code is preferably not provided, and I'm reading from the patent here, unless the prescriber, the pharmacy, the patient, the patient's risk group, and the patient's informed consent have been properly registered in the storage medium. So there's a fail-safe that goes above and beyond just the physician saying, OK, go ahead and prescribe the drug. With regard to the question of constitutionality and waiver, I completely forgot to mention in my opening argument the Square case, which was followed by the Hulu case at the board, where the board said we won't entertain constitutional arguments. My friend cited Thunder Basin and left out the part where the court recognized that the adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies, but points out that that rule is not mandatory. This court followed that in Riggins, which is cited in our briefs. And finally, I would urge the court to review the Dolan and Manta Law Review article, which is cited in our briefs, and I conclude by simply pointing out that the arguments that are being made about this being simply a procedural change are belied by the real-world facts that 75 percent of claims versus 12 percent in ex parte reexamination are being, quote, killed. Is that 75 percent after institution? 75 percent of instituted cases? I think that's right. So institution is a place where there are a lot of cases that swim right through. Well, it's not a lot of cases, but it's some cases. And, in fact, one last thing I'd point out is that unlike ex parte reexamination, the inter partes review system has brought what are the so-called reverse patent, I guess I should say non-practicing entities to not be provocative, but the term that's actually used in the literature is reverse patent trolls like CFAD who petition, and upon the mere petition, let alone the institution, the markets change and these reverse entities that are bringing these challenges who are not practicing at all in this space that are able to then short the stock and make money for their hedge funds. And the fact that they're making money off of the drop of our stock demonstrates beyond any reasonable case the taking that's occurring here. You cited the Square case? They're board decisions that refused to take up the question of constitutionality. Square is the one case that existed at the time of the board decision in this case. Hulu post-dated it, and Topgolf was about a month before Hulu, if my memory is correct. Those were both in June and July of 2018.